UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

APPLIED TECHNOLOGY, INC.,
Plaintiff,

v. 5:09-CV-0562
(GTS/GJD)

J.R. CLANCY, INC.,
Defendant.

---

APPEARANCES: OF COUNSEL:

PROFETA & EISENSTEIN
Counsel for Plaintiff
14 Wall Street, 22nd Floor
New York, New York 10005

JETHRO M. EISENSTEIN, ESQ.

BOND, SCHOENECK & KING, PLLC
Counsel for Defendant
One Lincoln Center
Syracuse, New York 13203

THOMAS D. KELEHER, ESQ.
DAVID L. NOCILLY, ESQ.

HON. GLENN T. SUDDABY, United States District Judge

**MEMORANDUM-DECISION and ORDER**

Currently before the Court, in this breach-of-contract action filed by Applied Technology, Inc. ("Plaintiff") against J.R. Clancy, Inc. ("Defendant"), are (1) Defendant's motion for partial summary judgment on Plaintiff's First Cause of Action and a portion of Plaintiff's Second Cause of Action, and (2) Plaintiff's cross-motion for partial summary judgment on its First Cause of Action. (Dkt. Nos. 13, 15.) For the reasons set forth below, Defendant's motion for partial summary judgment on Plaintiff's First Cause of Action is denied; Plaintiff's cross-motion for partial summary judgment on its First Cause of Action is granted; and Defendant's motion for partial summary judgment on a portion of Plaintiff's Second Cause of Action is granted.

# I. RELEVANT BACKGROUND

## A. Plaintiff's Claims

Generally, Plaintiff's Complaint alleges that Defendant breached a licensing agreement ("Agreement") entered into between the parties on December 11, 2003, which permitted Defendant to manufacture and sell winches using technological information relating to Plaintiff's patented motorized winch for raising and lowering theater scenery (the "Winch"). (*See generally* Dkt. No. 1 [Plf.'s Compl.].)[1] More specifically, Plaintiff's Complaint alleges as follows.

Under the Agreement, Defendant agreed to pay Plaintiff a license fee of $20,000 per year for five years, with the first installment of $20,000 having been already paid, and subsequent installments due on September 1st of each year, commencing September 1, 2004, and continuing until September 1, 2007, unless the Final Agreement had earlier been terminated in accordance with its terms. (*Id.*) Defendant also agreed to pay Plaintiff a 5% royalty on the net sales price of each "winch" embodying Plaintiff's technology and sold by Defendant, with a $200 minimum per winch. (*Id.*) Defendant had the right to terminate the Agreement after the Third Contract Year (which ended on September 1, 2006), on sixty days written notice to Plaintiff. (*Id.*) On September 30, 2005, before the end of the Third Contract Year, Defendant purported to terminate the Agreement, asserting that no royalties were payable or would become payable in the future under the Agreement, because the PowerLift® product that it was selling to customers was not a "winch" within the meaning of the Agreement. (*Id.*) Because Defendant's effort to

---

[1] A more specific definition of the "Winch" is contained in the parties' Agreement. (Dkt. No. 13, Attach. 2, at 11 [attaching Paragraph 1.12 of the Agreement].)

terminate the Agreement before the end of the Third Contract Year was ineffective, Defendant was required to make a license payment to Plaintiff in the amount of $20,000 on September 1, 2006. (*Id.*) In addition, Defendant is obligated under the Agreement to pay royalties on sales of its PowerLift® winches since October 2004. (*Id.*)

Based on these factual allegations, Plaintiff asserts two causes of action against Defendant: (1) a cause of action for breach of contract arising from Defendant's nonpayment of the Agreement's fourth annual $20,000 license fee allegedly due on September 1, 2006; and (2) a cause of action for breach of contract arising from Defendant's nonpayment of contractual royalties on sales of its PowerLift® winches allegedly due since October 2004. (*Id.*) Familiarity with the factual allegations in Plaintiff's Complaint supporting these two causes of action is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

**B. Parties' Motions for Partial Summary Judgment**

Generally, in support of its motion for partial summary judgment, Defendant argues as follows: (1) Plaintiff's First Cause of Action for breach of contract (arising from Defendant's nonpayment of the Agreement's fourth annual license fee allegedly due on September 1, 2006) should be dismissed as a matter of law because Defendant properly terminated the Agreement at the end of the Third Contract Year, which the Agreement unambiguously defined as August 31, 2006; and (2) Plaintiff's Second Cause of Action for breach of contract (arising from Defendant's nonpayment of contractual royalties on the sale of its PowerLift® winches allegedly due since October 2004) should be dismissed to the extent that it is premised on any sales occurring after Defendant terminated the Agreement, because that termination extinguished any contractual obligation of Defendant to pay future such royalties. (*See generally* Dkt. No. 13,

Attach. 3 [Def.'s Memo. of Law].)

Generally, in opposition to Defendant's motion for partial summary judgment, and in support of its own cross-motion for partial summary judgment on its First Cause of Action, Plaintiff argues as follows: (1) not only should judgment not be entered in Defendant's favor on Plaintiff's First Cause of Action, but judgment should be entered in Plaintiff's favor on that cause of action because, as a matter of law, Defendant did not terminate the Agreement until *after* the end of the Third Contract Year, based on the admissible record evidence; and (2) judgment should not be entered in Defendant's favor on the relevant portion of Plaintiff's Second Cause of Action because, even if Defendant did terminate the Agreement after the end of the Third Contract Year, Plaintiff is entitled to contractual royalties thereafter due to Defendant's continued manufacturing and selling of PowerLift® winches embodying Plaintiff's patented technology, given that (a) any such use of the technology violated Section 6 of the Agreement (labeled "License fees and Royalties," which constituted the only basis for Defendant's right to use the technology at issue, and/or (b) the constituted manufacture and sale violated Section 10 of the Agreement (entitled, "Confidentiality / Non-Disclosure"), which survived the Agreement's termination. (*See generally* Dkt. No. 15, Attach. 3 [Plf.'s Opp. Memo. of Law].)[2]

Generally, in its reply, Defendant argues as follows: (1) Plaintiff has failed to adduce admissible record evidence creating a genuine dispute of material fact regarding whether Defendant provided the requisite notice to terminate the Agreement in sufficient time for termination to occur at the instant the Third Contract Year ended; (2) after Defendant terminated

[2] Paragraph 10.4 of the Agreement provides as follows: "The obligations contemplated by this Section 10 shall survive the expiration or termination of this Agreement." (Dkt. No. 13, Attach. 2, at 17.)

the Agreement, Defendant's contractual duty to pay Plaintiff royalties for the future use of Plaintiff's patented technology evaporated; and (3) Plaintiff may not now hinge that contractual duty on Section 10 of the parties' Agreement given that (a) Plaintiff did not assert a claim for breach of Section 10 in its Complaint, and (b) the confidential information in question has been in the public domain since at least October 2004. (*See generally* Dkt. No. 17 [Def.'s Reply Memo. of Law].)

**C. Undisputed Material Facts**

Generally, the material facts giving rise to this action are undisputed by the parties. (*Compare* Dkt. No. 13, Attach. 4 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 14 [Plf.'s Rule 7.1 Response and Rule 6.1 Counter-Statement].) In addition, most of the handful of factual disputes encountered by the parties may be avoided by a strict adherence to the undisputed record evidence. (*Compare* Dkt. No. 13, Attach. 4, ¶¶ 8, 12, 13 [Def.'s Rule 7.1 Statement] *with* Dkt. No. 14, ¶¶ 8, 12, 13 [Plf.'s Rule 7.1 Response and Rule 6.1 Counter-Statement].) More specifically, the undisputed material facts of this case are as follows.

On July 23, 2003, Defendant paid $20,000 to Plaintiff as its first annual license fee payment under the terms of an interim license agreement while the Agreement was being finalized by the parties. On December 11, 2003, the parties executed the Agreement, which was entitled "Final Technology Transfer and License Agreement."

Paragraph 13.6 of the Agreement provided that "[t]his Agreement attached hereto contain [sic] the entire agreement between the parties with respect to the subject matter of this Agreement and supercedes [sic] all prior agreements and undertakings between the parties relating to same, including the Interim Agreement." Paragraph 6.1 of the Agreement provided

that Defendant would pay Plaintiff annual license fees of $20,000 per contract year for a period of five years, unless the Agreement was terminated earlier. Paragraph 6.1 of the Agreement further provided that Defendant had previously paid Plaintiff the first installment of $20,000, and that the four remaining installments of $20,000 would be payable on September 1 of each following year, commencing September 1, 2004, and continuing until September 1, 2007. Paragraph 1.1 of the Agreement provided that a "contract year" under the Agreement was a twelve month period beginning September 1 and ending on August 31. Paragraph 6.2 of the Agreement provided that Defendant would pay Plaintiff royalties in an amount equal to the greater of 5% of the net sales price or $200 minimum for each "Winch" sold by Defendant, as that term was defined in the Agreement. Paragraph 6.3 of the Agreement provided that "Earned Royalties shall be due and payable within forty five days at the end of each calendar quarter *during the term of this agreement*, based on Licensee's Net Sales of all Winches during such quarter." (Dkt. No. 13, Attach. 2, at 14 [emphasis added].) Paragraph 7.3 of the Agreement provided that Defendant "may terminate this Agreement, upon 60 days written notice to [Plaintiff] . . . without cause, any time *after the Third Contract Year*." (*Id*. at 14-15 [emphasis added].)

On September 3, 2004, Defendant sent a check for $20,000 for payment of the second annual license fee due under the Agreement. On September 30, 2005, Defendant sent a check for $20,000 for payment of the third annual license fee due under the Agreement. Along with that check, Defendant sent Plaintiff a letter that stated as follows, in pertinent part:

> As explained in previous correspondence, we are not using the Technical Information and Licensed Technology that you provided under the agreement. In the past Contract Year there were no Net Sales of the Winch as defined in the Agreement, thereby no Earned

> Royalties are payable under Paragraph 6.2 of the Agreement.
>
> Since we are not utilizing the technology and associated rights *we are exercising our rights pursuant to Paragraph 7.3(a) of the Agreement, by providing written notice that the Agreement is terminated effective 60 days from the date of this letter*. Based on this notice of the termination of the Agreement, the enclosed payment will be the final payment made thereunder.

(Dkt. No. 13, Attach. 2, at 25 [emphasis added].) On August 31, 2006, the Third Contract Year ended. At no point on or after September 1, 2006, did Defendant send Plaintiff a check for $20,000 as payment of any license fees for the Fourth Contract Year.

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga County Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B. Legal Standards Governing Plaintiff's Claims

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standards governing Plaintiff's claims in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which is intended primarily for the review of the parties. (*See generally* Dkt. No. 13, Attach. 3 [Def.'s Memo. of Law]; Dkt. No. 15, Attach. 3 [Plf.'s Opp. Memo. of Law]; Dkt. No. 17 [Def.'s Reply Memo. of Law].)

## III. ANALYSIS

### A. Plaintiff's First Cause of Action (Arising from Defendant's Nonpayment of the Agreement's Fourth Annual $20,000 License Fee Allegedly Due on September 1, 2006)

As stated above in Part I.B of this Decision and Order, Defendant argues that Plaintiff's First Cause of Action for breach of contract (arising from Defendant's nonpayment of the Agreement's fourth annual license fee allegedly due on September 1, 2006) should be dismissed because Defendant properly terminated the Agreement at the end of the Third Contract Year, which the Agreement unambiguously defined as August 31, 2006.

As stated above in Part I.C. of this Decision and Order, Paragraph 7.3 of the Agreement provided that Defendant "may terminate this Agreement, upon 60 days written notice to [Plaintiff] . . . without cause, any time *after* the Third Contract Year." (Dkt. No. 13, Attach. 2, at 14 [emphasis added].)

As an initial matter, the Court finds that "60 days written notice" term in Paragraph 7.3 of the Agreement is ambiguous in that it could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire Agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.[3] More specifically, the "60 days written notice" term is ambiguous as to whether (1) Defendant has to wait until the Third Contract Year has

---

[3] *See World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003) ("[A]mbiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.") (internal quotation marks omitted).

ended before it gives its 60 days written notice of termination to Plaintiff, or (2) Defendant may give that notice before the Third Contract Year has ended, provided that the 60-day period ends after the Third Contract Year has ended.[4] Because the Court finds the existence of this ambiguity to be immaterial to the conclusion drawn by the Court in Part III.A. of this Decision and Order (which results from a flaw that the Court perceives in Defendant's argument), the Court will assume–for purposes of Part III.A. of this Decision and Order only–that the "60 days written notice" term has the latter meaning.[5]

The flaw that the Court perceives in Defendant's argument is that the argument hinges on Defendant's ability to terminate the Agreement "at" the end of the Third Contract Year. Under the Agreement, Defendant could not terminate the Agreement "at" the end of the Third Contract

---

[4] The Court acknowledges that, as Defendant points out in its reply memorandum of law, if the "60 days written notice" term of Paragraph 7.3 has the former meaning, then the term would appear to limit the accompanying right of the licensee to terminate the Agreement at "any time after the third Contract Year." (Dkt. No. 17, at 4-5.) *See In Public Relations Bd., Inc. v. United Van Lines, Inc.*, 373 N.E.2d 727, 728-29 (Ill. App.3d 1978) (rejecting argument that earliest possible termination was February 29, 1976, 60 days after December 31, 1975, where termination clause provided that the agreement could be "cancelled by either party with 60 days advance notice any time after December 31, 1975"). However, the Court finds that Defendant's point is insufficient to render the "60 days written notice" term unambiguous (because the term could also be construed to reasonably mean that the termination described by Paragraph 7.3 may occur "at any time" after 60 days after the end of August 31, 2006). *See Tr. of N. Nevada Operating Eng'rs Health & Welfare Tr. Fund v. Mach 4 Constr., LLC*, 08-CV-0578, 2010 WL 3003183, at *2-3 (D. Nev. July 23, 2010) ("find[ing] [that the earliest possible termination date] is sixty days after . . . June 30, 2008," where contract provided that contract may be terminated "at any time after June 30, 2008" upon 60 days' written notice").

[5] The Court notes that, under New York law, "a termination notice which erroneously identifies the termination date is nonetheless sufficient to effect a termination as of the first proper termination date." *G.B. Kent & Sons, Ltd. v. Helena Rubinstein, Inc.*, 419 N.Y.S.2d 465, 466 (N.Y. 1979), *accord*, *Robert McRell Assoc. v. Ins. Co. of N. Am.*, 677 F. Supp. 721, 726 (S.D.N.Y. 1987).

Year. Rather, Defendant could do so only "after" the end of the Third Contract Year.[6] Furthermore, the Third Contract Year did not end until August 31, 2006, ended.[7] As a result, the earliest that Defendant could have terminated the Agreement was the start of September 1, 2006 (i.e., immediately *after* the end of August 31, 2006), the same instant at which Defendant incurred another $20,000 license fee.[8]

---

[6] (Dkt. No. 13, Attach. 2, at 14 [attaching Paragraph 7.3 of the Agreement, which provides, in pertinent part, that Defendant "may terminate this Agreement . . . any time *after* the Third Contract Year"] [emphasis added]; *cf.* Dkt. No. 13, Attach. 2, at 8 [attaching Paragraph 7.2(b) of the Agreement, which provides, in pertinent part, that "licensor may terminate this Agreement *at* the end of the initial five year term . . ."] [emphasis added].) The Court notes that, while the "after the Third Contract Year" term of Paragraph 7.3 of the Agreement may be harsh from Defendant's perspective, the Court can find no ambiguity in that term. *Cf. Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 669 (1950) (addressing circumstance in which seller delivered written notice of termination to buyer on December 2, 1946, because contract gave seller right to terminate contract by written notice to buyer delivered "at any time *after* December 1, 1946" but before issuance of certificate of public convenience) [emphasis added]. The Court notes further that, in its memoranda of law, while Defendant sometimes argues that it terminated the Agreement "at" the end of the Third Contract Year (i.e., on August 31, 2006), Defendant also repeatedly acknowledges that the Agreement could not be terminated until "after" the Third Contract Year. (Dkt. No. 13, Attach. 3, at 5, 6, 8, 11; Dkt. No. 17, at 4, 5, 6.)

[7] (Dkt. No. 13, Attach. 2, at 10 [attaching Paragraph 1.1 of the Agreement, which provides, in pertinent part, that the term "'Contract Year' shall mean each twelve month period during the term of this Agreement beginning on September 1 and ending on August 31"].) The Court notes that it can find no ambiguity with the "Contract Year" term in Paragraph 1.1 of the Agreement, especially given the fact that construing the "twelve month period" as ending at the very beginning of August 31 (rather than at the very end of August 31) would (1) render the contract discontinuous, and (2) shorten the "twelve month period" to an "eleven month thirty day period." *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless ... is not preferred and will be avoided if possible.'"); *Bank Julius Baer & Co. v. Waxfield Ltd.*, 424 F.3d 278, 283 (2d Cir. 2005) (observing that "canons of construction" forbid contractual interpretations that "lead to absurd results").

[8] (*See also* Dkt. No. 13, Attach. 2, at 13 [attaching Paragraph 6.1 of the Agreement, which provides, in pertinent part, that "[s]ubsequent installments shall be payable on September 1 of each year commencing September 1, 2004 and continuing until September 1, 2007 unless this Agreement shall have been *earlier* terminated in accordance with its terms"] [emphasis added].)

For these reasons, Defendant's motion for partial summary judgment on Plaintiff's First Cause of Action is denied; and Plaintiff's cross-motion for partial summary judgment on its First Cause of Action is granted.

**B. Relevant Portion of Plaintiff's Second Cause of Action (Arising from Defendant's Nonpayment of Contractual Royalties on Sale of Its PowerLift® Winches Allegedly Due Since October 2004)**

As stated above in Part I.C of this Decision and Order, Defendant argues that Plaintiff's Second Cause of Action for breach of contract (arising from Defendant's nonpayment of contractual royalties on the sale of its PowerLift® winches allegedly due since October 2004) should be dismissed to the extent that it is premised on any sales occurring after Defendant terminated the Agreement, because (1) that termination extinguished any contractual obligation of Defendant to pay future such royalties, and (2) Plaintiff may not now hinge that contractual duty on Section 10 of the parties' Agreement given that (a) Plaintiff did not assert a claim for breach of Section 10 in its Complaint, and (b) the confidential information in question has been in the public domain since at least October 2004.

For the reasons articulated by Defendant in its memoranda of law, the Court agrees with Defendant. (Dkt. No. 13, Attach. 3, at 12-13 [attaching pages "8" and "9" of Def.'s Memo. of Law]; Dkt. No. 17, at 7-10 [attaching pages "4" through "7" of Def.'s Reply Memo. of Law].) Under the circumstances, Plaintiff cannot sue for *contractual* royalties allegedly accruing after the Agreement was terminated by Defendant.[9] As Defendant correctly argues, the parties'

---

[9] *See United Prods. Corp. v. Standard Textile Prods. Co.*, 231 N.Y.S 115, 117-18 (NY App. Div., 1st Dep't 1928) (implicitly recognizing that the only contractual royalties available to the plaintiff in a breach-of-contract action consisted of the unpaid contractual royalties accruing until the date on which the termination of the contract became operative, and expressly stating that, "[defendant] recognized its liability for the payment of the annual

agreement was essentially one in which Plaintiff agreed not to sue Defendant for infringement during the pendency of the contractual period; the Agreement having now been terminated, if Defendant uses Plaintiff's patented technology, Plaintiff's cause of action would be for patent infringement, not breach of the Agreement's royalties section.[10]

The Court acknowledges Plaintiff's argument that Defendant's duty to pay the royalties in question (i.e., the contractual royalties accruing due to Defendant's use of technological information relating to Plaintiff's patented winch *after* Defendant effectively terminated the parties' agreement) arises from the fact that Defendant's continued usage of technological information violates the Agreement's confidentiality section (i.e., Section 10 of the Agreement). However, the Court is not persuaded by that argument for two alternative reasons.

First, Plaintiff has not pled facts plausibly suggesting that its breach-of-contract claim for nonpayment of royalties under the royalty section of the Agreement (i.e., Section 6 of the Agreement) is premised on Defendant's post-termination use of confidential information, in

---

minimum royalty until the termination of the contract a year [after notice of termination was given]"); *Ives v. Mars Metal Corp.*, 196 N.Y.S.2d 247, 249 (Sup. Ct., N.Y. Cnty. 1960) (granting "judgment . . . to the plaintiff for the amount of royalties requested in his complaint up to January 15, 1958 [the effective date of termination of the contract], with appropriate interest").

[10] *See*, *e.g.*, *Kamakazi Music Corp. v. Robbins Music Corp.*, 684 F.2d 228, 230 (2d Cir. 1982) ("[Plaintiff's] suit is, was, and always has been based on the Copyright Act. [Plaintiff] sued [Defendant] for publishing Manilow works after the [licensing] contract between the two had expired. Once the contract had expired, [Defendant] was liable for infringement of [Plaintiff's] copyrights. Given the explicit language of [Plaintiff's] complaint, and the acts complained of, it is frivolous for [Defendant] to contend that its contractual defense makes [Plaintiff's] suit one for breach of contract."); *Demalco Ltd. v. Feltner*, 588 F. Supp. 1277, 1280 (S.D.N.Y. 1984) (holding that no licensing contract existed with which defendant could have tortiously interfered after December 6, 1981, because the license granted by the contract on that date, and explaining that the "attempt to exploit the film after [the contract's] expiration was, if anything, an infringement of plaintiff's license, not a breach of contract").

violation of the confidentiality section of the Agreement (i.e., Section 10 of the Agreement). (*See generally* Dkt. No. 1 [Plf.'s Compl.].) For example, conspicuously absent from Plaintiff's Complaint is any factual allegation plausibly suggesting that, after Defendant effectively terminated the Agreement, Defendant either (1) disclosed to any third party any "proprietary and non-public information, records, devices, methods and processes, including the Technical Information . . . relating to [the] Agreement," or (2) failed to "return to [Plaintiff] confidential information . . . [in Defendant's] possession, . . . [which was] not . . . in the public domain or . . . generally known to the public . . . ." (*Id.*) Moreover, the Court agrees with Defendant that any such claim is futile to the extent that it is premised on the disclosure of "information, devices, methods and processes" that was (or could be) easily acquired or copied from Defendant's PowerLift® product, because Plaintiff has pled facts plausibly suggesting that Defendant started selling its PowerLift® product, which "embodies" that information, in "October 2004." (*Id.* at ¶¶ 24, 25, 28.)[11]

Second, even if Plaintiff had stated such a claim, the case that Plaintiff cites in support of its argument (that a breach of a contract's confidentiality clause could give rise to the payment of

---

[11] *See Eagle Comtronics, Inc. v. Pico, Inc.*, 453 N.Y.S.2d 470, 472 (N.Y. App. Div., 4th Dep't 1982) ("[T]he technology and the manufacturing process of the traps and interference filters [used in the cable television industry were not] trade secrets. . . . There was substantial evidence at trial that the mechanical aspects of the trap were not secret, nor was the circuitry unusual or difficult to formulate. The proof demonstrated that any secrecy in the design of the trap was lost when it was placed upon the market; that the design of the trap could be easily acquired and copied; that in its efforts to promote sales, Eagle openly displayed cut-away samples of the trap and disclosed its electronic characteristics to competitors at trade shows; and that the effort and amount of money expended by the Eagle principals in developing the trap was not very great. . . . The interference filter is a device very similar to the trap, and . . . it is clear that the interference filter could easily be copied by others without using improper means."), *appeal denied*, 458 N.Y.S.2d 1025 (N.Y. 1982).

contractual royalties) is inapposite. The case that Plaintiff cites involved a contract that (arguably) expressly provided that a licensee could continue to use a licensor's product after the contract terminated.[12] That is not what Section 10 of the Agreement in question provides.[13] Indeed, Section 6 of the Agreement rather clearly limits the payment of royalties to the duration of the contract.[14]

For each of these alternative reasons, Defendant's motion for partial summary judgment is granted on the relevant portion of Plaintiff's Second Cause of Action (i.e., that portion premised on any sales occurring after Defendant terminated the Agreement). Having said that, the Court hastens to add that, because it has found the "60 days written notice" term of Paragraph 7.3 to be ambiguous (for the reasons stated above in Part II.A. of this Decision and Order), a genuine dispute of material fact exists as to whether the date of termination was September 1, 2006, or October 31, 2006 (i.e., 60 days after September 1, 2006).[15] As a result,

---

[12] *See Topps Co., Inc. v. Cadbury Stani SAIC*, 526 F.3d 63, 66-72 (2d Cir. 2008) (finding that genuine dispute of material fact existed regarding plaintiff's trade-secrets claim arising from defendant's alleged continued manufacturing of licensed product after the license agreement terminated, because fact issue existed regarding defendant's defense that the agreement expressly permitted defendant to continue using product after expiration of agreement).

[13] (Dkt. No. 13, Attach. 2, at 17 ["Upon termination of this Agreement, . . . the rights to make, use or sell [winches] . . . based on or [incorporating] essential aspects of the core technology transferred by Licensor to Licensee . . . , shall revert back to Licensor."].)

[14] (Dkt. No. 13, Attach. 2, at 14 ["Earned Royalties shall be due and payable within 45 days of the end of each calendar quarter *during the term of this Agreement* . . . . *While this Agreement remains in force*, incorporation of Winch Improvements in Winches made, sold or leased by Licensee, . . . shall not relieve Licensee of its obligations to pay the royalties on such Winches as recited in this Section 6."] [emphasis added].)

[15] The Court notes that, contrary to Plaintiff's calculations, the Court finds that–if the ambiguous "60 days written notice" term were construed in its favor–that 60-day period (which would start at the beginning of September 1, 2006, and end at the end of October 30,

while Defendant is not responsible for any royalties after October 31, 2006, the issue of whether Defendant is responsible for royalties between September 1, 2006, and October 31, 2006, survives as part of the sole remaining claim in this action (i.e., Plaintiff's Second Cause of Action to the extent that it is premised on any sales occurring after "October 2004," and before Defendant terminated the Agreement).

**ACCORDINGLY,** it is

**ORDERED** that Defendant's motion for partial summary judgment on Plaintiff's First Cause of Action (Dkt. No. 13) is **DENIED**, and Plaintiff's cross-motion for partial summary judgment on its First Cause of Action (Dkt. No. 15) is **GRANTED**; and it is further

**ORDERED** that Defendants' motion for partial summary judgment on a portion of Plaintiff's Second Cause of Action (Dkt. No. 13) is **GRANTED**, such that Plaintiff's Second Cause of Action is **DISMISSED** to the extent that it is premised on any sales occurring after Defendant terminated the Agreement.

Dated: May 12, 2011
Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge

2006), would result in a termination date of October 31, 2006, not October 30, 2006. (Dkt. No. 15, Attach. 3, at 9 [attaching page "9" of Plf.'s Opp. Memo. of Law].)